UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| STEVEN ALAN CARR, et al., | ) |
| | ) |
| Plaintiffs, | )   1:24-cv-772-SEB-MJD |
| | ) |
| v. | ) |
| | ) |
| TRUSTEES OF PURDUE | ) |
| UNIVERSITY, et al., | ) |
| | ) |
| Defendants. | ) |

**Combined Reply Memorandum in Support of Motion for Preliminary Injunction and Response Memorandum in Opposition to Motions to Dismiss**

**Introduction**

The defendant Trustees of Indiana and Purdue Universities and the intervenor State of Indiana (collectively "defendants") primarily oppose the professors' Motion for Preliminary Injunction on justiciability grounds. They have also filed, based on the same argument, motions to dismiss this matter pursuant to Federal Rule of Civil Procedure 12(b)(1). (Dkts. 56, 58).[1] For purposes of all of these motions, the defendants do not appear to contest the facts as presented by the professors in their opening brief (Dkt. 50 at 4-12).[2]

The bottom line is simple: S.E.A. 202 ("the Act") regulates the content of the professors' speech. The result is that some speech is being chilled, and some risks being compelled. This is occurring today, as the professors prepare for their courses to begin on August 19th (Purdue University) and August 26th (Indiana University), and will continue to apply to all of their teaching

---

[1]     The State filed a combined brief in opposition to the professors' Motion for Preliminary Injunction and in support of the State's Motion to Dismiss (Dkt. 57), in which the Boards of Trustees joined (Dkt. 59). The professors follow the State's lead and submit a combined brief.

[2]     In the professors' view, some of those facts are incorrectly characterized by the defendants in the course of their arguments. Those are addressed individually below.

[1]

activities and engagements with students. This violates their right to academic freedom, protected by the First Amendment, and the offending portions of the Act should be enjoined.

## Argument

I. **The professors' claims are justiciable**

   A. **The Act applies to the professors and explicitly regulates their speech**

For a claim to be justiciable in federal court, a plaintiff "must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021) (citations omitted).

The defendants' first argument rests on an exceedingly strange contention: that the Act does not apply to the professors at all, and therefore it cannot injure them. According to the defendants, "the Act itself only applies to Boards of Trustees" and "does not apply to individual educators." (Dkt. 57 at 9). The Act is therefore immune from challenge, the argument goes, because only the policies implemented by universities' Boards of Trustees could be the source of any constitutional violation. (*Id.*). This is incorrect.[3]

To state the obvious, the Act does—and is intended to—regulate the speech of Indiana's public university faculty. The challenged provisions single out only "faculty members" as subject to the substantive requirements of the law, and there can be no doubt that it is their speech that the statute seeks to, and does, reach. In order to keep their jobs, avoid discipline, and receive tenure or promotion, it is the professors, *not* the Boards of Trustees, who are required, as of July 1, 2024, to "foster a culture of free inquiry, free expression, and intellectual diversity." (Dkt. 49-1 at 6, 7 [Ind. Code §§ 21-39.5-2-1(b)(1), 21-39.5-2-2(a)(1)]). It is the professors, *not* the Boards of Trustees, who must "expose students to scholarly works from a variety of political or ideological frameworks." (Dkt.

---

[3] It also seems, at best, a semantic argument. The professors' claims could also be framed as seeking to enjoin the universities from establishing and enforcing such policies, but that is a distinction without a difference. The Act is what offends the constitution, regardless of how relief is phrased.

[2]

49-1 at 6, 7 [Ind. Code §§ 21-39.5-2-1(b)(2), 21-39.5-2-2(a)(2)]). While the Boards of Trustees are certainly tasked with implementing the statute through their own policies, the statute mandates the existence and much of the substance of those policies. The defendants simply ignore that the statute does not limit itself to laying out general educational principles or aspirations: it imposes affirmative obligations on the professors that *must be included* in whatever policies the Boards adopt.

The defendants also erroneously contend that "Act's scope is limited to *universities*—with instructions, guidelines, and penalties *for the universities* if they fail to follow the Act's instructions." (Dkt. 57 at 10 [emphasis in original]). It is the professors, and *not* the Boards of Trustees, who face penalties for failing to meet the Act's instructional and speech-based requirements. (Dkt. 49-1 at 6, 7 [Ind. Code §§ 21-39.5-2-1(b), (c); 21-39.5-2-2(d)]). The Act imposes additional obligations on the Boards of Trustees—for example, to establish a mechanism by which students and employees can submit complaints regarding professors' speech (Ind. Code § 21-39.5-4), and to file annual summary reports regarding the existence and outcome of complaints (Ind. Code § 21-39.5-4(a)(5)). But even here, the statute imposes *no penalties whatsoever* on the universities or their Boards of Trustees if they fail to comply with those mandates. To put it simply, whatever policies the Boards of Trustees ultimately adopt, only faculty members bear any negative consequences for violating the Act.

Of course, the Act designates the universities' Boards of Trustees as the enforcers of the law's substantive provisions. But there is nothing unique about this statutory scheme, and the Indiana Code is replete with similar examples. The statutes regulating certain professions, for instance, designate professional licensing boards as the state entities that enforce the substantive terms, mandated by statute, that regulate the professionals' conduct. *See, e.g.,* Ind. Code §§ 25-13-1-1 to 25-13-3-14 (dental hygienists); §§ 25-15-1-1 to 25-15-10-9 (embalmers and funeral directors); §§ 25-26-1-1 to 25-26-26-24 (pharmacists); §§ 25-34.1-1-1 to 25-34.1-12-2 (real estate brokers and salespersons); §§ 25-1-9-1 to 25-1-9-23 (health professions generally). Surely the defendants would not contend that a physician

lacks standing to challenge a state statute regulating the practice of medicine because of the role played by the Indiana Medical Licensing Board. The Act clearly reaches the professors' speech, and the defendants' contrary contentions are without merit.[4]

### B. The Act injures the professors now and threatens imminent future injury, and this matter is ripe for review

The professors have discussed at length the many ways in which they are currently changing the content and pedagogy of their courses solely to attempt to comply with the Act. (Dkt. 50 at 8-12).

The professors "may show standing for a pre-enforcement First Amendment challenge to a law when they resort to self-censorship out of 'an actual and well-founded fear' that the law will be enforced against them." *Brown v. Kemp*, 86 F.4th 745, 767 (7th Cir. 2023) (quoting *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. at 383, 393 (1988)). "The injury-in-fact standard is often satisfied in pre-enforcement challenges to limitations on speech. The Supreme Court has recognized self-censorship as a distinct harm that can be realized even without an actual prosecution." *Ctr. for Indiv. Freedom v. Madigan*, 697 F.3d 464, 473-74 (7th Cir. 2012). As a result, "[t]he chilling of protected speech may thus alone qualify as a cognizable Article III injury, provided the plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them."[5] *Id.* at 474.

The defendants do not dispute that the Boards of Trustees intend to comply with the law, so the risk of the law's application to the professors is real. *See, e.g., Majors v. Abell*, 317 F.3d 719, 721 (7th

---

[4] The defendants also describe this as a problem of causation: they contend that the yet-to-be-promulgated policies—and not the Act—would be the source of any injury, and therefore no injuries would be fairly traceable to the Act. (Dkt. 57 at 11-12). This again ignores that the statute requires the universities to promulgate these policies and requires specific content. For the reasons articulated above, this argument fails.

[5] The defendants contend that in order to raise this pre-enforcement challenge, the professors must demonstrate, as "a necessary element," an intent to violate the Act. (Dkt. 57 at 10). This is simply an incorrect statement of the law, and one that the Supreme Court and the Seventh Circuit have expressly rejected. *See, e.g., Brown*, 86 F.4th at 767 ("The Supreme Court and this court have repeatedly held that plaintiffs can show standing for pre-enforcement challenges even where they disclaim the intent needed to violate a challenged statute."). In any event, such an argument does not make sense when one of the problems with the Act that it is so vague that the professors are not sure what compliance entails.

[4]

Cir. 2003), *certified question accepted as to unrelated issue*, 785 N.E.2d 226 (Ind. 2003), and *certified question answered,* 792 N.E.2d 22 (Ind. 2003) ("A plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute."). Likewise, the defendants do not dispute that the plaintiffs are changing the content and pedagogy of their courses to try to comply.

Instead, the defendants appear to contend that these measures are unnecessary, and therefore should not confer standing. Although not phrased as such, the defendants appear to challenge whether the professors' fears are "well-founded," contending that the professors have indicated that they already comply with the demands of the statute, and therefore cannot suffer any injury from it. (Dkt. 57 at 10-11). But this argument can only be made by mischaracterizing the professors' testimony. As even the quotes cited by the defendants state, what the professors have indicated is that they try to implement—as a matter of good pedagogical practice—*their own conceptions* of principles of free inquiry, free expression, and intellectual diversity, and they routinely present a variety of perspectives in the course of their instruction. (*Id.* [citing each professor on this point]). But the professors have made equally clear that they do not believe or understand their past practices to comply with the current statute—that is precisely why they are changing their curricula and pedagogies now.

As Professor McDonald highlighted, "creating a syllabus is one of the most important steps in the learning process. This is long before [he has] actually been introduced to one of [his] students." (Dkt. 49-9 at 23 [ll. 21-25]). At Purdue, the first day of class is August 19, 2024 (Dkts. 49-2 at 2, 49-4 at 2), and at Indiana University, students begin on August 26, 2024 (Dkts. 49-6 at 2, 49-8 at 2). So although the school year has not yet begun for students, the professors are currently actively engaged in developing and planning their courses—all of which are impacted by the requirements of the Act. (Dkts. 49-2 at 5-9, 49-3 at 70 [l. 23] – 71 [l. 10] [Carr]; Dkts. 49-4 at 4-9, 49-5 at 41 [ll. 2-18], 42 [ll. 6-10], 44 [ll. 5-7], 46 [ll. 20-21], 46 [l. 22] – 47 [l. 13], 51 [ll. 13-20], 52 [ll. 8-9], 53 [ll. 13-16], 55 [ll. 8-10]

[Schuster]; Dkts. 49-6 at 5-10, 49-7 at 48 [ll. 13-20], 57 [l. 12] – 58 [l. 12], 61 [ll. 2-7] [Scheurich]; Dkts. 49-8 at 4-8, 49-9 at 62 [l. 7] – 66 [l. 1] [McDonald]). The changes the professors feel compelled to make include both forgoing speech or classroom activities they would otherwise have included and adding content they otherwise would not have, both now and continuing throughout the academic year. *Id.* They are being injured now and face further injury throughout the academic year.

These present and concrete injuries also render their claims ripe for review. A claim is not ripe if it "involves uncertain or contingent events that may not occur as anticipated, or not occur at all" or if "the possibility of any future injury is too remote." *Capeheart v. Terrell*, 695 F.3d 681, 684-85 (7th Cir. 2012). Relying again on their contention that only future implementing policies may offend the Constitution, the defendants argue that any injury to the plaintiffs is too remote to be currently justiciable. (Dkt. 57 at 12-13). According to the defendants, "[t]his Court cannot know whether, how, and to what extent, an implementing policy may eventually implicate Plaintiffs' alleged First Amendment right to academic freedom." (*Id.* at 13). Certainly any resultant policies may additionally implicate the professors' rights to academic freedom, but that is beside the point. The statute is *today* infringing their First Amendment rights, and that is enough to establish a ripe case or controversy.

**II.    The Professors are Likely to Succeed on the Merits of their Claims**

   **A. Public university professors have a right to academic freedom, and the Act infringes that right[6]**

As the professors previously described at length, the Supreme Court has not yet addressed the question *Garcetti* left open regarding its application to university professors' speech.[7] (Dkt. 50 at 13-

---

[6]    The defendants first argue that the professors' First Amendment claims fail because the Act "does not regulate speech at all." (Dkt. 57 at 13). Instead, defendants contend, the Act merely provides the Boards of Trustees "a standard by which to evaluate how educators contribute to a holistic learning environment." (Id.). This is a bizarre pronouncement, given that it is undisputed that the professors necessarily "contribute to" the learning environments in which they work via their speech. The statute applies to speech.

[7]    The defendants appear to suggest that *Garcetti*'s holding explicitly applies to professor speech. (Dkt. 57 at 14-15 ["The instruction offered by state-employed educators at public universities is likewise government

17). The professors agree that Seventh Circuit case law establishes that classroom teaching provided by elementary and secondary school teachers is government speech, and therefore is outside the reach of the First Amendment's protections. Much of the defendants' argument on the merits merely reiterates the elementary/secondary school case law, without acknowledging the Seventh Circuit's own admonition that the speech of public university professors presents a different legal question, given *Garcetti*. (*See* Dkt. 57 at 15-16 [citing *Webster v. New Lenox Sch. Dist. No. 122*, 917 F.2d 1004, 1007 (7th Cir. 1990) (junior high teacher and decided before *Garcetti*), *Mayer v. Monroe Cty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (elementary school teacher and specifically indicating open question regarding university professors), *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022) (high school football coach), *Brown v. Chicago Bd. Of Educ.*, 824 F.3d 713, 715 (7th Cir. 2016) (sixth-grade teacher).[8] The defendants completely ignore that the great weight of authority holds that *Garcetti* does not apply in the context of university faculty speech. (Dkt. 50 at 13-17); *see also Heim v. Daniel*, 81 F.4th 212, 226-27 (2d Cir. 2023) (discussing cases). This Court should join this chorus.

Assuming a right to academic freedom exists, the defendants raise two final arguments in support of the statute: (1) the Act exempts any speech that could be protected by the First Amendment (Dkt. 57 at 17-18); and (2) any academic freedom belongs to universities and not to their faculty (*id.* at 18). Both of these arguments are non-starters.

No reasonable interpretation of the Act supports a conclusion that its exclusion of the professors' "research and public commentary on subjects" Ind. Code § 21-39.5-2-1(c)(1), relied upon

---

speech. When 'public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes.'" (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 412 (2006)]). While the defendants may believe that *Garcetti* should apply to university professors, *Garcetti* does not so hold.

[8]     The cited out-of-circuit cases defendants are, for the same reason, inapposite. (Dkt. 57 at 16-17 [citing *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332 (6th Cir. 2010) (high school teacher), *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 697 (4th Cir. 2007) (high school teacher), *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 800-02 (5th Cir. 1989) (high school teacher and decided before *Garcetti*)]).

by the defendants, also exempts the professors' instruction and interactions with students. The Act applies to tenure and employment decisions, which are based on assessments of the professors' teaching activities and student engagement. And the Act dictates what the professors must "expose students" to. The Act reaches the professors' student-facing activities, as intended, and that is the only necessary inquiry to determine whether it implicates their academic freedom. It does.

And one need look no further than *Garcetti* to confirm that, if a right to academic freedom exists, it belongs to the professors. The rule put forward in that case involves speech by *individual employees*—not their government employers—and Justice Souter, in raising the alarm regarding the rule's impact, was concerned for the academic freedom of the educators, who necessarily "speak and write pursuant to…official duties." *Garcetti*, 547 U.S. at 438 (Souter, *J*., dissenting).[9] The academic freedom at issue here belongs to the professors.

### B.  The statute fails the required balancing

The professors' opening brief described the framework that applies to government regulations like this one, which apply to speech before it occurs. (Dkt. 50 at 17-18). The proper analysis is the test articulated in *United States v. National Treasury Employees' Union*, 513 U.S. 454 (1994) ("*NTEU*").[10] "[T]he government's prospective restriction of future speech is approached with a greater presumption of unconstitutionality than post-hoc disciplinary actions against specific employees for speech already uttered." *Wernsing v. Thompson*, 423 F.3d 732, 747 (7th Cir. 2005). To justify such prospective regulation, the government must show that both present and future employees' interests "in a broad range of present and future expression are outweighed by that expressions' 'necessary impact on the actual

---

[9]     This is confirmed by all of the academic freedom case law, in which the right was deemed to belong to the professors. *See, e.g., Heim v. Daniel*, 81 F.4th 212 (2d Cir. 2023); *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021); *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019); *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014); *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011).

[10]    The defendants erroneously state that the professors agree that this restriction must be evaluated under *Pickering* balancing, which applies to *post hoc* challenges to individual employment decisions. (Dkt. 57 at 19).

operation' of the Government." *Crue v. Aiken*, 370 F.3d 668, 678 (7th Cir. 2004) (quoting *NTEU,* 513 U.S. at 468) (further citation omitted).

The defendants postulate the professors' interest as "not promoting a classroom environment of free inquiry, free expression, and intellectual diversity," characterizing that interest as "relatively weak." (Dkt. 57 at 19). That interest would be weak, if it were theirs, but it isn't. Their interest, as they have made clear, and which defendants have not disputed with any evidence, is in maintaining their autonomy to determine the content and pedagogy of their instruction and to be free from government interference in their out-of-classroom interactions with students. (Dkt. 50 at 19-20).

On the flipside, the defendants generally characterize the government's interest as promoting free inquiry, free expression, and intellectual diversity. (Dkt. 57 at 19-20). But of course, the defendants must establish that the professors (and all other professors) controlling the content and pedagogies of their own courses will, necessarily, adversely impact the "actual operation of the government." *Crue*, 370 F.3d at 678 (citation omitted). They cannot do so. While the defendants generally invoke, in a parade of horribles fashion, the evils that would flow from "permitting individual educators to enforce whatever classroom environment they wish" (Dlkt. 57 at 19), they do not mention that faculty of the State's institutions of higher learning, until this statute, have been functioning in precisely this fashion (including Indiana University since 1820 and Purdue University since 1869). The government simply does not have an interest in requiring the professors to, against their will, reach to the margins of scholarship, or to teach "political ideologies." The professors described some of the instructional topics that they believe may be implicated, such as the Holocaust (Dkt. 49-2 at 5), eugenics (*id.* at 6), the "culture wars" and the LGBTQ rights movement (Dkt. 49-4 at 4-5), slavery (Dkts. 49-4 at 5, 49-6 at 5-6), the genocide of Native Americans (Dkt. 49-6 at 5-6), and the Israeli-Palestinian conflict (Dkt. 49-8 at 5). But these are merely a handful of examples derived from a statutory scheme that touches every element of the professors' work.

[9]

As the undisputed evidence establishes, the professors have all been given their universities' unequivocal stamps of approval regarding their teaching activities and interactions with students. They have all been granted tenure. (Dkts. 49-2 at 1, 49-4 at 1, 49-6 at 1, 49-8 at 1). Professors Carr and Scheurich have attained "full professor" status—a promotion from an initial grant of tenure as an associate professor. (Dkts. 49-2 at 1, 49-6 at 1). Professor Scheurich has been named a Chancellor's Professor. (Dkt. 49-6 at 1). Professor McDonald has served two terms as his department's Chairperson. (Dkt. 49-8 at 1). All of them serve in advisory capacities to students—formal, informal, or both. (Dkts. 49-2 at 2, 49-5 at 34 [l. 16] – 35 [l. 2], 49-6 at 1, 49-9 at 44 [l.19] – 46 [l. 3]). No student has ever lodged a complaint against any of the professors. (Dkts. 49-3 at 76 [l. 14] – 77 [l. 18], 49-5 at 58 [l. 9] – 59 [l. 1], 49-7 at 39 [l. 25] – 40 [l. 8], 49-9 at 72 [ll. 7-18]). The government has no interest in regulating the professors' speech in this manner.

### C. The statute is vague and overbroad

As the professors indicated in their opening brief, the Seventh Circuit does not appear to have directly addressed how to perform a vagueness and overbreadth analysis in the context of an *NTEU* claim. (Dkt. 50 at 21). Other circuits have simply merged this analysis into the weighing conducted under *NTEU*, and the professors adopted this analysis as it was, at least arguably, a standard less favorable to them than a "standalone" vagueness and overbreadth challenge. The defendants appear to prefer a standalone analysis.

"Vague laws force potential speakers to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 807 (2011) (quotation and citation omitted) (cleaned up). Therefore, if "the potential chilling effect on protected expression [is] both real and substantial" a statute may be "invalidate[d] . . . as void for vagueness in a facial challenge." *Ctr. for Indiv. Freedom*, 697 F.3d at 479. A companion to vagueness challenges is the overbreadth doctrine, under which "a statute is facially invalid if it prohibits a

substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). This is because "the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exercise of ideas." *Id.* But the statute's overbreadth must be "*substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* (emphasis by the Court).

Whatever the analysis, the Act is both vague and overbroad. As the professors have described, *supra*, this statute reaches every aspect of their professorial duties—inside and outside of the classroom, as to both pedagogy and content and they simply do not know what the statute's key terms means because they are fatally vague. (Dkt, 50 at 7-8). Even if the State had an interest in forcing the professors to teach certain content or in a certain way, and even if it had set this out in a discernable manner, there can be no question that this interest does not extend as far as the statute mandates, impacting all aspects of their speech activities.

And whatever analysis applies, another key conclusion emerges: if the statute cannot be constitutionally applied to these professors, it cannot be constitutionally applied at all. *See, e.g., Harman v. City of New York,* 140 F.3d 111, 118 (2d Cir. 1998) ("[U]nder the Pickering/NTEU test the distinction between facial and as-applied constitutional challenges becomes unimportant."). Considered under *NTEU,* the defendants must justify the statute as to the broad range of expression engaged in by "both present and future employees." *Crue*, 370 F.3d at 678 (quoting *NTEU,* 513 U.S. at 468) (further citation omitted). If analyzed as a standalone vagueness/overbreadth claim, "the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *United States v. Hansen*, 599 U.S. 762, 770 (2023).

### III. The other factors for preliminary injunctive relief are met

The defendants' arguments as to the other factors are based solely on their arguments on the merits. (Dkt. 57 at 23 ["Plaintiffs have failed to establish those requirements for the same reasons they

have failed to establish a likelihood of success on the merits."]). The plaintiffs therefore do not further address these factors, and as indicated in their opening brief, they are satisfied. The defendants also do not dispute that any injunction should be issued without bond.

## Conclusion

The professors are likely to prevail on their claim that S.E.A. 202 is unconstitutional. A preliminary injunction should be issued to prevent the enforcement of Indiana Code § 21-39.5-2-1(b)(1), Indiana Code § 21-39.5-2-1(b)(2), Indiana Code § 21-39.5-2-2(a)(1), and Indiana Code § 21-39.5-2-2(a)(2), and to the extent that this provision provides for the available disciplinary actions, Indiana Code § 21-39.5-2-2(d).

Stevie J. Pactor
Kenneth J. Falk
Gavin M. Rose
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
spactor@aclu-in.org
kfalk@aclu-in.org
grose@aclu-in.org

Attorneys for Plaintiffs