UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| STEVEN ALAN CARR, <br> DAVID G. SCHUSTER, <br> JAMES SCHEURICH, <br> DAVID MCDONALD, <br>           Plaintiffs, <br>     v. <br> TRUSTEES OF PURDUE UNIVERSITY, <br> TRUSTEES OF INDIANA UNIVERSITY, <br>           Defendants. <br><br> STATE OF INDIANA, <br>           Intervenor. | No. 1:24-cv-00772-SEB-MJD |

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AND DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs Steven Carr, David Schuster, James Scheurich, and David McDonald (collectively "Plaintiffs")—each a tenured professor at an Indiana public university—brought this action against Defendants Trustees of Purdue University and Trustees of Indiana University (collectively "Boards"), seeking a preliminary injunction to enjoin the enforcement of Senate Enrolled Act 202 ("SEA 202"), Indiana Code § 21-39.5 *et seq.* (effective July 1, 2024), which requires the Boards to promulgate and implement policies regarding faculty members' tenure and promotions, on the grounds that SEA 202 violates the First and Fourteenth Amendments to the United States Constitution. Dkt. 8. Intervenor-Defendant State of Indiana ("the State") and the Boards (collectively "Defendants") have moved to dismiss

1

this lawsuit for lack of subject-matter jurisdiction. Dkt. 56, 58.[1] For the reasons explained below, the Motions to Dismiss, dkt. 56, 58, are **GRANTED** and the Motion for Preliminary Injunction, dkt. 8, is **DENIED**.

## BACKGROUND

### I.   SEA 202

Effective July 1, 2024, SEA 202 amends the Indiana Code statutes relating to higher education by creating a new article entitled "State Educational Institutions: The Protection of Free Inquiry, Free Expression, and Intellectual Diversity" and codified as Indiana Code § 21-39.5 *et seq.* SEA 202 directs the boards of trustees of state public higher education institutions, including the Boards of Trustees of Purdue and Indiana University, respectively, to adopt new policies aimed at ensuring that faculty members' pedagogies align with the principles of free inquiry, free expression, and intellectual diversity.

Pertinent here, section 1(b) provides as follows:

> [E]ach board of trustees of an institution shall establish a policy that provides that a faculty member may not be granted tenure or a promotion by the institution if, based on past performance or other determination by the board of trustees, the faculty member is:
>
> (1) unlikely to foster a culture of free inquiry, free expression, and intellectual diversity within the institution; [or]
>
> (2) unlikely to expose students to scholarly works from a variety of political or ideological frameworks that may exist within and are applicable to the faculty member's academic discipline.

---

[1] Rather than file a separate brief, the Boards have moved for joinder with the State's supporting brief, concurring that jurisdictional issues of ripeness and standing, as discussed in the State's Rule 12(b)(1) motion and supporting brief, warrant dismissal of this case and denial of Plaintiffs' requested relief. Dkt. 59. The Boards' motion is **GRANTED**.

I.C. § 20-39.5-2-1(b)(1)–(2) ("section 1(b)").

SEA 202 defines neither "free inquiry" nor "free expression" (nor the term "unlikely"), though it does define "intellectual diversity" as "multiple, divergent, and varied scholarly perspectives on an extensive range of public policy issues." *Id.* § 21-39.5-1-5.

Section 2(a) provides, in relevant part:

> Not later than five (5) years after the date that a faculty member is granted tenure by an institution and not later than every five (5) years thereafter, the board of trustees of an institution shall review and determine whether the faculty member has met the following criteria:
>
> > (1) Helped the institution foster a culture of free inquiry, free expression, and intellectual diversity within the institution.
> >
> > (2) Introduced students to scholarly works from a variety of political or ideological frameworks that may exist within the curricula established by the:
> >
> > > (A) board of trustees of the institution under IC 21-41-2-1(b);[2] or
> > >
> > > (B) faculty of the institution acting under authority delegated by the board of trustees of the institution.

*Id.* § 21-39.5-2-2(a)(1)–(2) ("section 2(a)").[3]

In evaluating a faculty member's performance under section 2(a), boards of trustees may not consider certain statutorily identified activities conducted by the faculty member,

---

[2] Indiana Code § 21-41-2-1(b) authorizes boards of trustees of state universities to "prescribe the curricula and courses of study offered . . . and define the standards of proficiency and satisfaction within the[m] . . . ."

[3] Section 4, which Plaintiffs do *not* specifically challenge, directs universities to create a reporting mechanism through which third-parties may submit complaints regarding the adequacy of a faculty member's performance, stating, in relevant part, that "[e]ach institution shall . . . [e]stablish a procedure that allows both students and employees to submit complaints that a faculty member . . . is not meeting the criteria described in section 2(a) . . . ." I.C. § 21-39.5-2-4(a)(1).

3

including "(1) [e]xpressing dissent or engaging in research or public commentary on subjects"; "(2) [c]riticizing the institution's leadership"; and "(3) [e]ngaging in any political activity conducted outside the faculty member's teaching or mentoring duties at the institution." *Id.* § 21-39.5-2-1(c). Nothing in Article 39.5 "may be construed to . . . [l]imit or restrict the academic freedom of faculty members or prevent faculty members from teaching, researching, or writing publications about diversity, equity, and inclusion or other topics." *Id.* § 21-39.5-6-1(3).

Institutions are also required to "adopt a policy that establishes disciplinary actions . . . that the institution will take if the board of trustees determines . . . that a tenured faculty member has failed to meet one (1) or more of the criteria described in" section 2(a). *Id.* § 21-39.5-2-2(d). Such disciplinary measures may include "(1) termination; (2) demotion; (3) salary reduction; (4) other disciplinary action as determined by the institutions; or (5) any combination" thereof. *Id.* § 21-39.5-2-2(d).

## II. The Professors

### A. Professor Steven Alan Carr

Steven Alan Carr ("Mr. Carr") is a professor of Communication, the Graduate Program Director of the Department of Communication, and the Director of the Institute for Holocaust and Genocide Studies (the "Institute") at Purdue University Fort Wayne ("PFW"). He began teaching at PFW in 1994 and was awarded tenure in 2000. In 2016, Mr. Carr was promoted to full professor status.

As a professor of Communication, Mr. Carr teaches courses in media and cultural studies, and, as the Graduate Program Director, he advises approximately twenty graduate

4

students. In his role at the Institute, he supports and promotes instruction and research about the Holocaust and other genocides as well as public engagement in global genocide prevention efforts.

In the upcoming 2024–25 academic year, Mr. Carr is scheduled to teach four courses: Introduction to Graduate Studies in Communication; Women, Men and Media; Documentary and Experimental Film and Video; and Mass Media Criticism.

### B.    Professor David F. Schuster

David Schuster ("Mr. Schuster") is an associate professor in PFW's Department of History. He began teaching at PFW in 2006 and was awarded tenure in 2012. Although he intends to continue in his current position, he is also seeking a promotion to full professorship.

In the upcoming academic year, Mr. Schuster is scheduled to teach the following history courses: American History I; American History II; U.S. History since World War II; Historically Speaking: Intro to Historical Communication; and Senior Seminar: Local History.

### C.    Professor James Scheurich

James Scheurich ("Mr. Scheurich") is a Chancellor's Professor at Indiana University Indianapolis's School of Education, where he has been tenured since 2012. He also coordinates the Urban Education Studies program and, as such, oversees more than seventy doctoral students in the program.

Mr. Scheurich's research and coursework focus on matters of diversity, equity, and inclusion in educational systems and society writ large, which implicates issues of systemic

racism and anti-LQBTQ prejudice. In the 2024–25 academic year, he plans to teach Early Inquiry in Urban Education; Issues in Urban Education; and Advanced Critical Qualitative Inquiry.

### D. Professor David McDonald

David McDonald ("Mr. McDonald") is an associate professor in the Department of Folklore and Ethnomusicology at Indiana University Bloomington, where he has taught since 2008 and has been tenured since 2014. He has served two rotations as Chair of his department and intends to seek full professor status in 2025 as well as any additional promotions available thereafter.

Mr. McDonald's scholarship focuses on the ethnomusicology of violence, war, and social movements, with a specialty in Israel and Palestine. In the upcoming academic year, he will teach Soundtrack to Revolution; Study of Ethnomusicology; Popular Culture and Politics in the Middle East; and Paradigms in Ethnomusicology.

## III. This Litigation

On May 7, 2024, Plaintiffs brought this § 1983 action against the Boards, seeking injunctive and declaratory relief on the grounds that SEA 202—on its face—infringes on their First Amendment right of academic freedom to determine the content of their instruction without state interference. According to Plaintiffs, sections 1(b) and 2(a) of the newly-enacted statute, as recited above, violate the First Amendment as well as the Due Process Clause of the Fourteenth Amendment because they are impermissibly vague.

In the operative version of their complaint, Plaintiffs aver that "they do not know what it means to 'foster a culture of free inquiry, free expression, and intellectual diversity

6

within the institution,' " and, consequently, they "cannot discern what they are required to do or refrain from doing to avoid running afoul of the statute" and risking exposure to adverse employment actions. Am. Compl. ¶¶ 48–49, dkt. 19. Although Plaintiffs already strive to foster cultures of free inquiry in their classrooms, they believe that conforming their curricula to SEA 202 will require changes to the content of their courses, namely by way of the omission and/or addition of certain scholarly materials they would not otherwise necessarily include. Indeed, each Plaintiff avers that he has already made such modifications to his syllabi.

On May 13, 2024, Plaintiffs sought a preliminary injunction to enjoin the Boards from enforcing sections 1(b) and 2(a). Dkt. 8. On May 15, 2024, the State moved to intervene as of right to defend SEA 202's constitutionality. On July 22, 2024, Defendants moved to dismiss the complaint for lack of subject-matter jurisdiction, asserting that Plaintiffs lack standing and that their claims are not ripe. Dkt. 56, 58.

Plaintiffs' Motion for Preliminary Injunction and Defendants' Motions to Dismiss are now fully briefed and await our ruling. Because jurisdictional considerations "come before [the] merits," we begin our analysis with the State's and the Boards' motions to dismiss. *Flynn v. FCA US LLC*, 39 F.4th 946, 951 (7th Cir. 2022).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a federal court must dismiss an action where it lacks subject matter jurisdiction. In determining whether subject matter jurisdiction exists, a district court may properly "look beyond the jurisdictional allegations

7

in the complaint" and "view whatever evidence has been submitted." *Roman v. U.S. Postal Servs.*, 821 F.2d 382, 385 (7th Cir. 1987).

## DISCUSSION

Defendants contend that Plaintiffs' pre-enforcement challenge to SEA 202 does not satisfy the jurisdictional prerequisites under Article III because Plaintiffs lack standing and, relatedly, their claims are not ripe. As explicated in greater detail below, we agree that under the circumstances presented here, Plaintiffs have not satisfied the demands of Article III, thereby depriving this court of subject-matter jurisdiction over their claims.

Article III's Case or Controversy requirement "limits federal courts to resolving concrete disputes between adverse parties," effectively "prevent[ing] federal courts from answering legal questions, however important, before those questioned have ripened into actual controversies between someone who has experienced (or imminently faces) an injury and another whose action or inaction caused (or risks causing) that injury." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021). "Two related doctrines of justiciability—each originating in the case-or-controversy requirement of Article III—underlie [our] determination" in the case at bar. *Trump v. New York*, 592 U.S. 125, 131 (2020). The doctrine of standing, on one hand, demands that plaintiffs show (1) an injury-in-fact (2) fairly traceable to the defendants' challenged conduct and (3) capable of being redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The doctrine of ripeness, on the other hand, requires that the case stand independent of "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump*, 592 U.S. at 131. In a pre-enforcement

8

challenge, such as the one presented here, ripeness and standing "plumb the same concept: timing." *Herrera v. Raoul*, 670 F. Supp. 3d 665, 676 (N.D. Ill.), *aff'd sub nom. Bevis v. City of Naperville, Ill.*, 85 F.4th 1175 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024).

The parties before us primarily dispute whether Plaintiffs have adequately alleged an injury sufficient to quell standing and ripeness concerns. An "alleged injury must be 'concrete and particularized' as well as 'actual or imminent, not conjectural or hypothetical . . . .' " *Sweeney*, 990 F.3d at 559 (quoting *Lujan*, 504 U.S. at 560). For a facial challenge under the First Amendment, "a prior enforcement action is not required" to establish an injury-in-fact. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020). Absent a prior enforcement action, "plaintiffs must [nonetheless] make one of two showings . . . ." *Id.* First, plaintiffs may aver a *future* injury based on their "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and . . . a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Second, plaintiffs may demonstrate "a *current* injury if they have resorted to self-censorship out of an 'actual and well-founded fear' that the law will be enforced against them." *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (emphasis in original) (quoting *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)).

Self-censorship of protected First Amendment activities may qualify as a cognizable Article III injury so long as "the plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d

9

464, 474 (7th Cir. 2012) (quotations omitted); *see also id.* at 473 (stating that plaintiffs must show that they "face[ ] a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement"). The Supreme Court has explained, however, that "the 'chilling effect' associated with a potentially unconstitutional law 'being on the books is insufficient to justify federal intervention' in a pre-enforcement suit," even where "the challenged law in question is said to chill . . . the freedom of speech . . . ." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 50 (2021) (quoting *Younger v. Harris*, 401 U.S. 37, 42, 50–51 (1971)).[4] Rather, "plaintiffs must demonstrate that their fear is both actual and reasonable," not "merely 'imaginary or speculative.' " *Brown*, 86 F.4th at 761 (quoting *Babbitt*, 442 U.S. at 298). Likewise, litigants "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

"[M]any of these same precepts" also apply "in terms of ripeness," which "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Sweeney*, 990 F.3d at 559–60 (internal quotation and citation omitted). The ripeness determination turns on the fitness of the issues for judicial

---

[4] We recognize that the Seventh Circuit recently "ha[d] zero difficulty" finding standing where the plaintiffs before it had "credibly alleged that the statute pose[d] a threat of enforcement latent in the statute's existence and traceable to its enforcement." *Indiana Right to Life Victory Fund v. Morales*, No. 22-1562, 2024 WL 3716070, at *2 (7th Cir. Aug. 8, 2024). In *Morales*, the threat of enforcement was "latent" because the challenged campaign-finance law was decidedly unconstitutional and because the defendant state officials had not sufficiently neutralized all threats of the statute's enforcement, as "not every defendant . . . ha[d] filed an affidavit or taken any official action purporting to disavow any intent to enforce the challenged provisions . . . ." *Id.* Here, by contrast, not only is SEA 202's constitutionality as yet undecided but the contours of its "enforcement" are also entirely unclear—two differences that we believe distinguish this case from *Morales* and render SEA 202's threat of enforcement unknown and undeveloped.

10

review (i.e., the adequacy of the factual record) and the hardship to the parties in withholding pre-enforcement review. *Id.* at 560; *see Smith v. Wisc. Dep't of Agric., Trade & Consumer Prot.*, 23 F.3d 1134, 1141 (7th Cir. 1994).

In light of these controlling principles, we turn to an analysis of the issues presented in the case at bar. We begin by evaluating whether Plaintiffs have adequately shown an "injury that is the result of [the] statute's actual or threatened *enforcement*, whether today or in the future." *California v. Texas*, 593 U.S. 659, 670 (2021) (emphasis in original). Applying Article III's justiciability principles, we conclude that the text of SEA 202 and the (limited) clarity regarding the Boards' final policy formulations and implementation, taken together, do not support a finding of standing or ripeness regarding Plaintiffs' claims.

Plaintiffs maintain that they are currently being injured by the chilling effect of the requirements imposed by SEA 202 on their protected First Amendment activities, as evidenced by the fact that they have already felt compelled to make changes to their syllabi in the form of their preemptive efforts to abide by SEA 202's dictates.[5] They argue that SEA 202 substantively burdens university faculty members by conditioning their continued employment, tenure, and salary on their having "foster[ed] a culture of free inquiry, free

---

[5] While Plaintiffs assert broadly that SEA 202 injures them both now *and* threatens imminent injury in the future, they cited only to the current injury standard. We evaluate Plaintiffs' standing argument accordingly, noting, however, that "a credible threat of enforcement is critical [under either theory]; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and self-censoring instead." *Speech First*, 968 F.3d at 638 n.1 (internal quotation marks omitted) (quoting *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018)); *see also Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010) ("When plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, they do not allege a dispute susceptible to resolution by a federal court.") (internal quotations omitted).

expression, and intellectual diversity." I.C. § 21-39.5-2-1(b)(1). While SEA 202 does task the Boards with promulgating and subsequently implementing such policies, it also "mandates the existence and much of the substance of those policies." Dkt. 61 at 3. Coupled with the Boards' stipulated intentions to comply with SEA 202, Plaintiffs characterize the risk of the law's application to them as real and wholly sufficient for Article III purposes. *Id.* at 4.

Defendants respond, arguing that Plaintiffs' fears are purely speculative and untethered to any credible threat of enforcement because SEA 202 simply does not reach, never mind regulate or proscribe, any of Plaintiffs' desired conduct. According to Defendants, SEA 202 applies only to the Boards—not individual educators—directing "each board of trustees" to "establish a policy" that embodies the criteria set forth in section 1(b) and to conduct periodic performance reviews under section 2(a). To that end, Defendants reason, "any injury that Plaintiffs could *potentially* face would be attributable to" the presently nonexistent university policies, rather than to SEA 202 itself. Dkt. 57 at 9. Absent a university policy, Defendants contend, Plaintiffs' self-censorship is not, nor can it be, the result of a credible threat of SEA 202's enforcement.

We are guided, as always, by the statutory text. *See Indiana Right to Life Victory Fund v. Morales*, 66 F.4th 625, 627 (7th Cir.), *certified question answered*, 217 N.E.3d 517 (Ind. 2023). Section 1 "applies to . . . *institution*[*s*]" and directs their boards of trustees to "establish a policy," according to which "faculty member[s] may not be granted tenure or a promotion," if they fail certain criteria. I.C. § 21-39.5-2-1(a)–(b)(2) (emphasis added). Section 2 provides that "the board of trustees . . . shall review and determine whether the

12

faculty member has met" the criteria set forth therein. By its terms, therefore, SEA 202 governs the Boards, not individual faculty members, such as Plaintiffs. Plaintiffs apparently concede as much, specifically averring in their operative complaint that "[t]he statutory prohibitions and requirements imposed by this article apply to state higher educational institutions," Am. Compl. ¶ 14, dkt. 19; that SEA 202 "requires each institution" to adopt disciplinary policies, *id.* ¶ 18; that "[a]n institution is also required" to conduct performance assessments of its faculty members, *id.* ¶ 19; and that "[t]he statute requires the universities' boards of trustees to deny promotions" under prescribed circumstances, *id.* ¶ 46. Plaintiffs' contrary argument in their briefing that SEA 202 regulates their conduct directly is therefore incompatible not only with the statutory text but also their own prior framing of what SEA 202 purports to regulate.

The parties do not dispute that the Boards intend to comply with SEA 202's directives and, indeed, have apparently undertaken preliminary steps to do so.[6] Nonetheless, the fact that the Boards have started their efforts to create such policies in order to comply with the statutory directives does not cast light on what those policies (and their subsequent implementation) will entail, let alone how the policies may or may not ultimately impact Plaintiffs' First Amendment rights. Likewise, Plaintiffs have not addressed whether (or how) the Boards' interim policies arguably enhance their First Amendment concerns or otherwise heighten the threat of harm to them. Absent the formulation and enforcement of

---

[6] *Purdue Outlines Interim Policy Updates to Comply with Senate Enrolled Act 202*, Purdue University, https://bit.ly/3Y9B8uv (last visited August 8, 2024); *Faculty & Librarian Tenure*, Indiana University, http://bit.ly/3zP4bJM (last visited August 8, 2024); Indiana University SEA 202 Implementation Plans, dkt. 49-20.

13

these final policies, it is impossible to determine whether Plaintiffs do in fact have an "objectively good reason for refraining from speaking and self-censoring instead." *Speech First*, 968 F.3d at 638 n.1 (citations omitted). Plaintiffs' speculations as to how the Boards might interpret and apply SEA 202's goals of fostering free inquiry, free expression, and intellectual diversity within the academy—standing alone—do not suffice to demonstrate that they are being harmed by SEA 202 now or will be in the future.

"Nothing changes if we assess [Plaintiffs'] complaint through the lens of ripeness." *Sweeney*, 990 F.3d at 561. Claims "involv[ing] uncertain or contingent events that may not occur as anticipated" are unripe, thus depriving federal courts of jurisdiction to reach the merits. *Capeheart v. Terrell*, 695 F.3d 681, 684 (7th Cir. 2012) (citation omitted). Courts must "avoid the premature adjudication of cases when the issues posed are not fully formed, or when the nature and extent of the statute's application are not certain." *Triple G Landfills, Inc. v. Fountain Cnty. Bd. of Comm'rs of Fountain Cnty., Ind.*, 977 F.2d 287, 288–89 (7th Cir. 1992) (citations omitted).

Here, contingencies abound. Indeed, the critical element of determining the "nature and extent" of SEA 202's application reposes in the Boards' final policy promulgations, implementation, and enforcement. *Id.* Those steps will inform whether such policies conflict with Plaintiffs' conceptions of intellectual diversity; compel changes in their curricula; or otherwise infringe on their asserted constitutional right to academic freedom. Whatever conflicts may exist between the Boards and Plaintiffs' preferred curricula are—at this early juncture—not "fully formed." *Id.* Hence, Plaintiffs' predictions as to how the Boards may or may not eventually implement the admittedly "broad" aspirations of SEA 202 are "no

more than conjecture" and fall short of constituting a justiciable Case or Controversy under Article III. *Trump*, 592 U.S. at 131 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)).

Our decision today obviously turns on the premature timing of Plaintiffs' claims and "the attenuated chain of inferences necessary to find harm . . . ." *Clapper*, 568 U.S. at 414 n.5; *see Trump*, 592 U.S. at 134 ("At the end of the day, the standing and ripeness inquiries both lead to the conclusion that judicial resolution of this dispute is premature."). The source of Plaintiffs' alleged injury/injuries lies in university policies that do not yet exist, rendering their allegations unfit for judicial review. The challenged statute, in the meantime, simply "does not require them 'to do anything or to refrain from doing anything.' " *Trump*, 592 U.S. at 134 (quoting *Ohio Forestry Ass'n., Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

In accordance with our holding that Plaintiffs' asserted injuries remain inchoate and their claims for relief unripe, we express no view as to the merits of their constitutional claims, which must await further factual development. Because we find jurisdiction lacking, the whole matter must and will be dismissed without prejudice, including Plaintiffs' request for declaratory judgment. *California*, 593 U.S. at 673.

## CONCLUSION

For the reasons explicated above, we **GRANT** the Boards' Motion for Joinder, dkt. 59, **GRANT** Defendants' Motions to Dismiss without prejudice, dkt. 56, 58, and **DENY** Plaintiffs' Motion for Preliminary Injunction, dkt. 8.

Final Judgment shall enter accordingly.

IT IS SO ORDERED.

Date: 8/14/2024

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Kathleen M. Anderson
BARNES & THORNBURG, LLP (Fort Wayne)
kathleen.anderson@btlaw.com

James A. Barta
Office of the Indiana Attorney General
james.barta@atg.in.gov

Katelyn E. Doering
Office of IN Attorney General
katelyn.doering@atg.in.gov

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jenna Lorence
INDIANA ATTORNEY GENERAL
jenna.lorence@atg.in.gov

John R. Maley
BARNES & THORNBURG, LLP (Indianapolis)
jmaley@btlaw.com

Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org

16

Dylan Pittman
BARNES & THORNBURG, LLP (Indianapolis)
dylan.pittman@btlaw.com

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org